ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN 1 0 2002

CLERK, U.S. DISTRICT COURT
By _____
          Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JAMAL ELHAJ-CHEHADE,  §
    Plaintiff,  §
      §
      §  CIVIL ACTION NO.
v.  §
      §  3:01-CV-01301-L
EDUCATIONAL COMMISSION FOR  §
FOREIGN MEDICAL GRADUATES,  §
    Defendant.  §

## BRIEF IN SUPPORT OF EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES MOTION FOR MORE DEFINITIVE STATEMENT OR, IN THE ALTERNATIVE, RESPONSE TO CHEHADE'S MOTION FOR SUMMARY JUDGMENT

The Education Commission for Foreign Medical Graduates ("ECFMG") respectfully submits its Brief in Support of it Motion for More Definitive Statement or, in the Alternative, Response to Chehade's Motion for Summary Judgment and in support thereof state as follows:

## I.    SUMMARY OF MOTION AND RESPONSE

1.    ECFMG recognizes that Jamal Elhaj-Chehade ("Chehade") is a *pro se* litigant. As such ECFMG expects the Court may grant some amount of leniency to the strict requirements of federal pleading because ECFMG is mindful that *pro se* pleadings generally are subject to generous construction.  However, ECFMG contends that Chehade's Motion for Summary Judgment is so lacking in clarity and conciseness of argument that ECFMG is unable to reasonably respond to his Motion for Summary Judgment.  ECFMG contends that Chehade should be ordered to replead his Motion to more fairly apprise ECFMG as to the factual basis and legal argument being presented.

2.    In the alternative and in an abundance of caution, ECFMG will provide a response to Chehade's Motion for Summary Judgment.  ECFMG further states that it filed a Motion for

69

Summary Judgment in this case on or about June 3, 2002. That Motion contends, among other things, that a final judgment in a prior suit between Chehade and ECFMG bars all of Chehade's claims under the doctrine of res judicata. It also alleges that Chehade's claims are barred under the applicable statutes of limitation and that Chehade lacks standing to assert a claim under 501(c)(3) of the Tax Code. ECFMG contends that those same arguments bar Chehade's Motion for Summary Judgment. Moreover, ECFMG states that there is sufficient summary judgment evidence to create a disputed issue of fact on every potential cause of action alleged in Chehade's Motion for Summary Judgment.

## II.   <u>MOTION FOR MORE DEFINITIVE STATEMENT</u>

3.     Federal Rule of Civil Procedure 8(e) requires that "every averment of a pleading shall be simple, concise, and direct." Additionally, Federal Rule of Civil Procedure 7)(b) states that all motions "shall state with particularity the grounds sought therefore, and shall set forth the relief or order sought." Rule 12(e) permits a party to move for a more definitive statement when a pleading "is so vague and ambiguous that a party cannot reasonably be required to frame a responsive pleading."

4.     ECFMG is mindful that Chehade is a *pro se* litigant and would probably have difficulty conforming to some of the technical pleading requirements in federal court. Nevertheless, Chehade's Motion for Summary Judgment is eleven pages of single-spaced allegations. Not only are no legal authorities cited, but the entire Motion is awkwardly worded and completely lacks coherency.

5.     Chehade's hodge-podge of allegations and rambling accusations makes it impossible for ECFMG to begin to form an understanding of 1) the causes of action which

Chehade is pursuing in his Motion;  2) the purported factual allegations that allegedly support this Motion; or  3) the evidence that Chehade contends supports his Motion.[1]

6. Because ECFMG is unable to reasonably determine the claims asserted, the underlying factual allegations, or the evidence relied upon, ECFMG moves this Court to require Chehade to more precisely and concisely present these items so that ECFMG may be able to adequately respond.

### III. RESPONSE TO CHEHADE'S MOTION FOR SUMMARY JUDGMENT

7. In an abundance of caution, ECFMG will provide a response to Chehade's Motion for Summary Judgment.  However, as stated in Section II, Chehade's Motion is vague and unclear which, in turn, makes it is impossible for ECFMG to be able to precisely respond to Chehade's Motion.  Therefore, Chehade will provide a complete overview of the facts it believes are relevant.

### IV. STATEMENT OF UNDISPUTED FACTS IN RESPONSE TO CHEHADE'S MOTION FOR SUMMARY JUDGMENT[2]

8. ECFMG is a not for profit organization. ECFMG, through its program of certification, assesses whether graduates of foreign medical schools are ready to enter residency or fellowship programs in the United States that are accredited by the Accreditation Council of Graduate Medical Education ("ACGME").  (APP002, ¶ 3)

---

[1] ECFMG is aware that Chehade has attached exhibits to his Motion as support.  However, there is no discussion or indication as to what exhibit(s) support what contentions.

[2] ECFMG filed its Motion for Summary Judgment on June 3, 2002.  That Motion included almost a verbatim recitation of the undisputed facts stated herein.  ECFMG considered simply incorporating that Motion into this response in order not to overburden the Court with redundant filings.  Nevertheless, ECFMG determined that the Court might desire not to have to refer to extraneous filings for such information.  Therefore, ECFMG is providing that information in this Response.

9.      ECFMG and its sponsoring organizations define a graduate of a foreign medical school as a physician who received his/her basic medical degree or qualification from a medical school located outside the United States, Canada or Puerto Rico. The medical school must be listed in the *World Directory of Medical Schools*, published by the World Health Organization, at the time of the physician's graduation. (APP002, ¶ 4)

10.     ECFMG certification assures directors of ACGME-accredited residency and fellowship programs, and the people of the United States, that graduates of foreign medical schools have met minimum standards of eligibility required to enter such programs. ECFMG certification does not, however, guarantee that such graduates will be accepted into these programs since the number of applicants frequently exceeds the number of available positions. (APP002, ¶ 5)

11.     The United States Medical Licensing Exam ("USMLE") is a single, 3-step examination for medical licensure in the United States. The Federation of State Medical Boards ("FSMB") and the National Board of Medical Examiners ("NBME") sponsor USMLE. It is governed through a jointly appointed Composite Committee consisting of representatives from the FSMB, the NBME, ECFMG and the public. The USMLE is not owned by or a part of ECFMG. The Composite Committee, of which ECFMG is a committee member only, establishes policies and procedures for the USMLE program. (APP002, ¶ 6)

12.     In the United States and its territories, a license to practice medicine is a privilege granted only by the individual medical licensing authorities of the various states and other jurisdictions (i.e., District of Columbia, Puerto Rico, the Virgin Islands). Each medical licensing authority sets its own rules and regulations and requires, as part of the licensing process, successful completion of the examination or other requirements demonstrating qualification for

licensure. Results of the USMLE are reported to these authorities for use in granting the initial license to practice medicine. USMLE provides these authorities with a common evaluation system for individuals applying for medical licensure. (APP003, ¶ 7)

13.    There are approximately 1400 foreign medical schools throughout the world, with varying educational standards and curricula. During the time period 1985 to 1989, ECFMG administered, on average, 38,000 medical science examinations annually to students and graduates of foreign medical schools. (APP003, ¶ 8)

14.    ECFMG is not funded by or through the United States Government or the State of Texas. (APP003, ¶ 9) To be eligible for certification by ECFMG, graduates of foreign medical schools must (1) pass a series of exams and (2) provide ECFMG with copies of a medical diploma that must be verified independently by the medical school to ECFMG. The primary reason for independent verification of medical school completion is to assure that medical diplomas are authentic. (APP003, ¶ 10)

15.    The time required to complete the certification process is different for each applicant. As of July 1, 1986, diploma verification became a requirement for those not certified by ECFMG. The period of time to complete the certification process depends largely on the capability and commitment of individual applicants. The testing process requires passing grades on examinations designed to assess basic medical science knowledge, clinical science knowledge and command of the English language. Once the candidate passes the basic medical science and clinical science examinations within the seven-year time limit required for ECFMG certification, the basic medical science and clinical science examinations do not need to be repeated for ECFMG certification, although individual state licensing requirements may differ. The English test is, however, valid for only two years for the purpose of entry into a residency program. If

the candidate does not enter an accredited residency program in the United States by the expiration date of the English test, the English test must be passed again before the applicant is eligible to enter a residency program. (APP003–APP004, ¶ 11)

16.    ECFMG verifies every medical school diploma with the appropriate officials of the foreign medical school that issued the diploma. ECFMG medical education credentials requirement is not satisfied until ECFMG receives such verification directly from the medical school. To verify medical school credentials ECFMG sends a formal request for verification to the medical school. The verification of medical credentials can be a lengthy process. Factors that may extend the verification process include processing time of the respective institutions; political climate in the relevant country; the nationality of the student; and the sophistication of a country's communication infrastructure, including telephone and postal conditions. Additional factors that would extend the verification process, also over which ECFMG has no control, include any strife or civil unrest in the country in which the graduate attended medical school. (APP004, ¶ 12)

17.    An ECFMG Certificate does not guarantee that a "certified" applicant will be accepted into a medical residency or fellowship training program. ECFMG certificate may be one of a multitude of criteria required of an applicant for a residency or medical internship by a residency program director. Each program establishes the qualifications and the levels of competency that it will accept for a residency program. Each State establishes the qualifications and the level of competency that it will accept for licensure as a medical professional. (APP004-APP005, ¶ 13)

18.    ECFMG has no authority or responsibility for the admission decision of any medical residency or fellowship program. Every admission decision is within the sole discretion

of the residency program director or person in authority at that particular institution. (APP005, ¶ 14) ECFMG has no authority or responsibility in the making of medical licensure decisions. The individual state medical boards make those decisions in the respective United States. (APP005, ¶ 15)

19. On March 1, 1985, Chehade submitted his application to take the basic medical science, clinical science, and English examinations. If an applicant fails one of the required examinations, he must submit a new application for each failed exam and pay the respective test fee. (APP005, ¶ 16; APP015) Chehade passed the English examination on his fifth attempt, on or about July 1987. (APP005, ¶ 17; APP016–APP020) Chehade passed the clinical science examination on his seventh attempt, on or about July 1988. (APP005, ¶ 17; APP016–APP022) Chehade passed the basic medical science examination on his eighth attempt, on or about January 1989. (APP005, ¶ 17; APP016–APP23)

20. Chehade has previously admitted that he was not entitled to an ECFMG certificate until he passed the examination requirements. (APP067) From the time that ECFMG sent Chehade's medical diploma to his medical school for verification in August 1986 until ECFMG's receipt of the independent verification from the Romanian medical school in July 1990 (APP049–APP051), Chehade did not fulfill the medical education credential requirement for ECFMG certification. ECFMG did not notify Chehade that verification of his diploma had been received until after it was received in July 1990. (APP005, ¶ 18; APP023–APP024; APP026–APP027; APP029; APP032–APP033; APP039; APP049–APP051)

21. Between 1985 and 1989 (APP025), there was no correspondence from Chehade checking on the verification of his medical school credentials. (APP006, ¶ 19; APP025) However, on March 21, 1989, ECFMG notified Chehade that he passed all the examinations

required for ECFMG certification, but he was not eligible for an ECFMG Certificate because he did not meet the medical credential requirements. (APP006, ¶ 20, APP023). Previously, ECFMG had attempted to verify Chehade's medical diploma with his Romanian medical school in August 1986. There was no response from the medical school. (APP006, ¶ 21, APP026)

22. In certain limited circumstances, when the foreign medical school does not respond to ECFMG's requests for verification of the medical diplomas of the medical school's graduates, ECFMG policy permits an alternate verification process. In this limited group of cases, ECFMG will consider sworn attestations from three physicians who were fellow students or faculty members at the candidate's medical school, or who had other personal knowledge that the candidate attended the specified medical school and graduated with a Doctor of Medicine or equivalent medical degree. The physicians making the sworn attestations must hold active unrestricted licenses to practice medicine in a state in the United States and must include their state license numbers in the sworn attestation. ECFMG reviews each attestation to confirm the attesting physician has personal knowledge of the candidate's graduation from medical school. ECFMG also verifies the license of the attesting physician with his or her medical licensing board. (APP006–APP007, ¶ 22; APP024; APP026; APP033).

23. ECFMG records reflect that it sent to Chehade the attestation forms in November 1987 and in June 1989. Chehade never returned the attestation forms to ECFMG. (APP007, ¶ 23; APP024; APP026) On April 21, 1989, ECFMG sent another request for verification to Chehade's medical school in Romania. ECFMG received no response from Chehade's medical school to this verification inquiry. (APP007, ¶ 24; APP024; APP026–APP027) Chehade was not surprised the verification was not yet sent from Romania. (APP028)

24.     In June 1989, ECFMG advised Chehade of an alternate method to send verification requests to the medical schools in Romania made at the request of the U.S. Embassy in Romania. The U.S. Embassy would act as a conduit in facilitating ECFMG's verification with the medical schools in Romania of the medical diplomas of graduates who were not nationals of Romania. ECFMG would send the verification requests along with the requisite fees to the U.S. Embassy for forwarding to the medical schools in Romania.   The U.S. Embassy would then forward the verification requirements to the medical schools.  (APP007–APP008, ¶ 25; APP026–APP027; APP029–APP030)

25.     In August 1989, ECFMG sent a verification request to the U.S. Embassy for six candidates who had attended three different medical schools in Romania, including Chehade. (APP029)  By letter dated August 24, 1989, ECFMG sent to Chehade a letter stating that in order to expedite the verification process, Chehade should contact the U.S. Embassy in Bucharest, Romania or his medical school in Romania.  (APP032)  ECFMG did not receive a response from the medical school until July 5, 1990.  (APP007, ¶ 26; APP049–APP051)

26.     By letter undated, received by ECFMG on April 17, 1990, Chehade accused ECFMG of discrimination.   The letter further criticized ECFMG for failure to complete the independent verification of his medical school graduation and stated "[t]he ECFMG credential department should realize the harm done to me by their attitude of 'indifference or I don't give a damn' toward me and probably toward others.'"  (APP008, ¶ 27; APP037)

27.     In response to Chehade's complaint that he could find no qualified doctors to verify his medical diploma (APP034), on May 17, 1990, ECFMG provided Chehade with the names and addresses of three individuals who attended medical school in Romania and who were licensed to practice medicine in the United States.  ECFMG requested that Chehade contact

ECFMG if he was experiencing difficulty in obtaining the three attestations. (APP008, ¶ 28; APP039)

28. From March 1990 to September 1990, Chehade wrote several "complaint" letters to U.S. Senator Phil Gramm, the *Dallas Morning News*, and U.S. Congressman John Bryant. Correspondence from these individuals to ECFMG included Chehade's complaint letters. In each letter, Chehade criticized ECFMG's credential verification process. (APP008, ¶ 29; APP035–APP036; APP043–APP048) Chehade stated in the letter to Senator Gramm, "I already lost one year and if I don't receive the certificate by April 1990 I will loose [sic] another year." (APP008, ¶ 30; APP036) In his letter to the *Dallas Morning News* in May 1990, Chehade stated "…to date ECFMG is playing games and mishandling the situation." "While I lost 2 years so far waiting and because I have to apply one year in advance for the residecy [sic] in hospitals, I already wasted 3 years as a result of their mishandling the situation." "I feel I was discriminate [sic] against by ECFMG…" "I really don't like to sue and waste more time." "I still cannot find any reason whatsoever for their negligent manner which not only discriminate against me but also resulted in costing me heavily in time, money and loosing [sic] many opportunities I might not get in the future. It also delays my licensure procedure." (APP008–APP009, ¶31; APP044)

29. In a follow-up letter to the *Dallas Morning News* in July 1990, Chehade states "I have the feeling that ECFMG is waging Psychological and economical warfare against me-I was also defamated [sic] as a result and I am paying a heavy price due to its incompetence, negligence and red tape." "Nowadays, I am really considering a law suit against ECFMG…I am currently seeking the lawyer that a medical Board cannot buy." (APP009, ¶32; APP046)

30. In his letter to Congressman John Bryant, received by ECFMG on October 1, 1990, Chehade states "[t]he ECFMG has committed a crime against my medical career and if

ECFMG cannot do the job.they [sic] (ECFMG) must be dismissed from their assignement [sic] ." (APP009, ¶33; APP048)  The United States Department of State contacted Chehade twice in July 1990 confirming receipt of his complaints regarding verification and "regretting the delay" caused in his case.  (APP058; APP059)   The United States Department of State informed Chehade that "applications for such documents from Romania, even when made through the Embassy, often involve a considerable delay in the response of the Romanian authorities." (APP058)

31.     In July 1990, ECFMG received verification of Chehade's medical diploma from his medical school in Romania through the United States Embassy.  (APP049–APP051)  From that date, ECFMG had all documentation necessary to issue to Chehade a Standard ECFMG Certificate.  From that date, Chehade could inform any residency program director that he had fulfilled the requirements for a Standard ECFMG Certificate.  (APP053)   The "Letter of Certification" issued to Chehade served as confirmation that he was certified by ECFMG and allowed him to apply for residency programs pending the printing of the actual Standard ECFMG Certificate.  (APP009–APP010, ¶34; APP052–APP053)

32.     Once an applicant has been certified by ECFMG, the role of ECFMG is limited. Upon request by a residency program, ECFMG will verify an applicant's ECFMG certification to an inquiring residency training program director.  ECFMG does not initiate communication with any residency program about a holder of an ECFMG certificate unless requested to do so by the applicant.  For example, in calendar year 1997, ECFMG's certification verification service processed over 63,000 requests from hospitals, credentialing agencies, state medical boards and residency program directors seeking to confirm ECFMG certification status of graduates of foreign medical schools.  (APP010, ¶35)

33.    The Standard ECFMG certificate contains the applicant's name, ECFMG number, dates he passed the basic medical science, clinical science and English examination, and the date issued.  The standard certificate will show the date of expiration of the English examination for the purpose of entry into a residency program.  To re-validate the English test, the English exam must be repeated.  Once re-validated, a validation sticker is placed on the certificate reflecting current status.  Before 1995, ECFMG required an applicant to return his original certificate and ECFMG would affix the re-validation sticker.  In 1995, ECFMG changed its procedure to forward the re-validation sticker directly to the applicant.  Other than the referenced statistical information, there are no other "codes" or special qualities of an ECFMG certificate that would provide any "hidden" or adverse information about an applicant to a medical residency program.  (APP010, ¶36; APP055)

34.    ECFMG maintains up to date records of all candidates' ECFMG history.  ECFMG records reflect the most current English test and validity date of the English test for the purpose of entry into a residency program for a candidate, even if the candidate's Standard ECFMG certificate itself does not reflect the most current dates.  (APP011, ¶37)

35.    At the time the "Letter of Certification" was issued to Chehade on August 7, 1990, the correct validity date of his English test for the purpose of entry into a residency program was July 1990.  (APP052)  This is because the results of ECFMG English test Chehade had taken on July 18, 1990 were not yet available.  The result of Chehade's July 18, 1990 ECFMG English test was reported to him on September 12, 1990.  (APP054)  The most recent English test date on the Standard ECFMG Certificate issued to Chehade on October 31, 1990 should have been updated to include the results of his July 1990 English test pass to show as valid for entry into a residency program through July 1992.  The original standard certificate sent to Chehade showed an English

test "valid through" date of July 1990. If Chehade had contacted ECFMG to have the English test dates on his ECFMG Certificate updated, he would have been requested to return the Standard Certificate so that a revalidation sticker could be affixed. If, at that time, a residency program director had contacted ECFMG to verify Chehade's certification status, the program director would have been advised that the English test was valid through July 1992 for the purpose of entry into a residency program. (APP011, ¶38)

36.     ECFMG has no record of any inquiry from any residency training program concerning Chehade or Chehade's ECFMG Certificate nor had Chehade returned his ECFMG Certificate for validation of his July 1990 English examination. (APP011, ¶39)

37.     ECFMG plays no part in the establishment of admission requirements by individual residency programs. Thus, a program is free to accept candidates with particular skills, it may limit the number of times an applicant has taken ECFMG tests, or it may establish a minimum score threshold on ECFMG examinations for admission. Thus, just because a "passing score" for ECFMG certificate in the basic medical science and clinical science examinations is 75 does not mean that a medical residency program must accept that score as its admission criteria. (APP012, ¶40)

38.     ECFMG has no knowledge or information about any application that Chehade may have sent to any medical residency program. ECFMG did not participate in the decision making process of any residency training program that received an application for admission from Chehade. (APP012, ¶41)

39.     Chehade originally entered the United States in 1984 to visit family. Due to civil war in Lebanon, Chehade was allowed to remain in the United States under a Temporary Protective Status program with a temporary immigration visa. Chehade had to renew his

temporary visa every six months. Chehade left the country in July 1993 when the United States did not renew his visa. From July 1993 to September 1996, Chehade lived in Lebanon. Chehade returned to the United States under a permanent resident status in September 1996. (APP066, APP068–APP075)

40.     Between 1994 and 1997, Chehade let the validity of his ECFMG English test lapse for the purpose of entry into a residence program. Without a current passing grade on the English examination, Chehade was ineligible for entry into an accredited residency program. To revalidate his ECFMG examination, in March 1997, Chehade took and passed ECFMG English examination. Although not required to take two tests, in January 1997, Chehade also took the TOEFL (Test of English as a Foreign Language) exam. Chehade directed the results of the TOEFL exam to ECFMG. (APP012, ¶42; APP056)

41.     ECFMG received a score report from TOEFL on March 18, 1997 showing that Chehade had taken the January 1997 TOEFL and had met the English requirement for re-validation of the English requirement on his ECFMG certificate. (APP056) Chehade requested a revalidation sticker from ECFMG by letter received by ECFMG on March 24, 1997. (APP057) The sticker was sent to Chehade that same day. (Id.) Chehade's ECFMG English test would now be valid through January 1999 for the purpose of entry into a residency program. (APP012–APP013, ¶43; APP055)

42.     Chehade applied to residency programs all over the United States. In 1997 alone, Chehade applied for over 1000 medical residency positions across the United States. (APP076) Chehade was not offered one position for a medical residency or internship program. (APP076–APP079)

43.     ECFMG did not promise Chehade that it would assist him in obtaining admission into a medical residency program.  ECFMG did not guarantee Chehade's admission into a residency program.  ECFMG did not promise to verify Chehade's foreign medical diploma within a certain period of time.  Chehade admits that ECFMG did not guarantee him a job. (APP013, ¶44; APP080)

44.     ECFMG did not enter into a contract with Chehade in which it agreed to assist Chehade in obtaining admission into a medical residency program.  ECFMG did not enter into a contract with Chehade in which it guaranteed Chehade's admission into a residency training program.  ECFMG did not enter into a contract with Chehade in which it agreed to verify his foreign medical diploma within a certain period of time.  (APP013, ¶45)

45.     ECFMG did not publish or send any false correspondence concerning Chehade to any third party.  ECFMG did not conspire with any person or entity to inflict a wrong or injury to Chehade.  (APP013, ¶46)  Chehade admits he has no documents to prove collusion between ECFMG and a third party.  (APP081–APP082)  Chehade was never an employee of ECFMG. Chehade did not seek employment with ECFMG.  (APP013, ¶47)

46.     ECFMG is authorized by the United States Information Agency (USIA) to sponsor foreign national physicians as Exchange Visitors in the United States.  Participation is designated by visa sponsorship category of either J-1 Alien Physician (ACGME accredited programs) or J-1 Research Scholar (research programs).  (APP013, ¶48)  To be eligible for the J-1 Alien Physician visa for entry into an ACGME accredited program, a candidate must: (i) complete ECFMG certification, (ii) have a fully executed contract for entry into a residency program and (iii) agree to return to his home country for some stated time to practice medicine at

the end of his medical training. If Chehade was never accepted into a residency program, he would not have been eligible for the J-1 visa status. (APP014, ¶49)

47. ECFMG has no control over the number of residency positions offered to potential J-1 Visa holders. ECFMG has no control over the number of residency positions offered to ECFMG Standard Certificate holders, of which Chehade was one. The type of residency program, the number of foreign medical graduates admitted, the threshold requirements for admission, and the caliber of medical student sought were all within the exclusive control and responsibility of the individual residency training program. (APP014, ¶50)

## V. ARGUMENT AND AUTHORITIES

### A. Procedural History

48. Chehade originally filed suit against ECFMG in 1999 in a case styled *"Jamal Elhaj-Chehade v. ECFMG, et al"* in Civil Action No. 3:99-CV0680-D in the United States District Court for the Northern District of Texas, Dallas Division (the "Prior Suit"). (APP088 – APP089) His Complaint in the Prior Suit contained a mish-mash of allegations which included a 14th Amendment-type deprivation allegation and a "racketeering" allegation (APP094, ¶ III, 1); defamation and "alienation" from friends and society (APP095, ¶ III, 2, 3); discrimination on the basis of age, race, ethnic background, national origin, citizenship status and retaliation (APP095, ¶ III, 3); severe emotional distress (APP095, ¶ III, 3); and slavery (APP095, ¶ III, 4). ECFMG ultimately obtained a summary judgment against Chehade on all of his claims on its basis that his claims were barred by applicable statutes of limitations or that he failed to provide any facts to support his cause of action. (APP109 - APP136) Chehade appealed ECFMG's summary judgment in the Prior Suit to the Fifth Circuit Court of Appeals. (APP137-APP138) The Fifth

Circuit Court of Appeals dismissed Chehade's appeal for failing to present any nonfriviolous issues for appeal. (APP137-APP138)

**B.**  **The Final Judgment in the Prior Suit Bars All of Chehade's Claims under the Doctrine of Res judicata.**

49.  All of Chehade's claims are barred by the doctrine of res judicata.  Claim preclusion, or "pure" res judicata, is the "venerable legal canon" that insures the finality of judgments and thereby conserves judicial resources and protects litigants from multiple lawsuits. *Medina v. I.N.S.*, 993 F.2d 499, 503 (5th Cir.1993). Claim preclusion is appropriate when four conditions are satisfied.  First, the parties in a later action must be identical to (or at least be in privity with) the parties in a prior action. Second, the judgment in the prior action must have been rendered by a court of competent jurisdiction. Third, the prior action must have concluded with a final judgment on the merits. Fourth, the same claim or cause of action must be involved in both suits. *Eubanks v. Federal Deposit Ins. Corp.*, 977 F.2d 166, 169 (5th Cir.1992). When these conditions are satisfied, claim preclusion prohibits either party from raising any claim or defense in the later action that was or could have been raised in support of or in opposition to the cause of action asserted in the prior action. In re Howe, 913 F.2d 1138, 1144 (5th Cir.1990).

50.  One motivating principle behind claim preclusion is waiver. If a party does not raise a claim or a defense in the prior action, that party thereby waives its right to raise that claim or defense in the subsequent action. "[T]he effect of a judgment extends to the litigation of all issues relevant to the same claim between the same parties, whether or not raised at trial." *Kaspar Wire Works, Inc. v. Leco Engineering & Mach. Inc.*, 575 F.2d 530, 535 (5th Cir.1978); *see also Allen v. McCurry*, 449 U.S. 90, 94 (1980) (holding that claim preclusion applies to

claims that "were or could have been raised" in a prior action that involved "the parties or their

privies" when the prior action had been resolved by "a final judgment on the merits.").

51.     Chehade's Complaint in the Current Suit fails to state any factual support for any

of Chehade's causes of action.  These allegations, however, presumably are based on all of the

facts associated with Chehade's prior lawsuit.  In fact, they have to be based on the very same

facts from the Prior Suit because, except for litigating the Prior Suit, there has been no

relationship or interaction between Chehade and ECFMG since 1990.  Therefore, Chehade has

not and cannot allege any facts to support his causes of action that are separate and apart from

those in asserted in the Prior Suit.

52.     In granting ECFMG's Motion for Summary Judgment in the Prior Suit, the Court

found that all Chehade's causes of action in the Prior Suit were barred by the statute of

limitations and that he lacked evidence of one or more of the necessary elements (APP109 –

APP136).  This granting of Summary Judgment constitutes a prior final judgment on the merits

by a court of competent distinction. (APP109 – APP136).  Since that time, no new facts have

been asserted, or could have been asserted, that would support Chehade's causes of action in the

Current Suit.  Further, the Current Suit is based upon the same claims that were raised, or could

have been raised, in the previous suit.  Accordingly, all of Chehade's claims are barred under the

doctrine of res judicata.

**C.     All of Chehade's Claims are Barred Under Applicable Statute of Limitations.**

53.     Even if Chehade's claims are not barred by the doctrine of res judicata, they are

all barred by the applicable statute of limitations.  Again from his vague Motion for Summary

Judgment, it is difficult precisely understand what Chehade is asserting.   Nevertheless,

practically every cause of action is governed either by a two-year statute of limitations or a four-

year statute of limitations. *See* TEX. CIV. PRAC. REM. CODE ANN. §§ 16.003(a); 16.004(a); 16.051.

54. The summary judgment evidence establishes that all alleged acts or omissions committed by ECFMG occurred no later than 1990. Additionally, Chehade was actually aware of the commission of these alleged acts no later September 1990 as evidenced by him writing several "complaint" letters to U.S. Senator Phil Gramm, the *Dallas Morning News*, and U.S. Congressman John Bryant. (APP008, ¶ 29; APP035–APP036; APP043–APP048). Yet Chehade waited over ten years to file this suit. Clearly, the applicable statues of limitations bar all of his causes of action.

**D.     Chehade Lacks Standing in His Claim for Violated the tax laws + fraud + violation of the non profit status including 501(c)(3) + contract + corruption**

55. Chehade appears to be arguing that ECFMG is not actually a non-profit organization. However, in his concurring opinion in *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 96 S.Ct. 1917 (1976), Justice Stewart stated that he could not "imagine a case, at least outside the First Amendment area, where a person whose own tax liability was not affected ever could have standing to litigate the federal tax liability of someone else." Many cases following the *Simon* case involve individuals complaining of injuries resulting from someone else's tax-exempt status under 501(c)(3). Only in very narrow circumstances, none of which apply to this case, have these individuals had standing.

56. The dictates of Article III of the United States Constitution, federal courts are confined to adjudicating actual "cases" and "controversies." U.S. CONST. Art. III, §2, cl.1. Of the doctrines that have evolved under Article III, including standing, mootness, ripeness, and

political question, the requirement that the litigant have standing is perhaps the most important.

*See Allen v. Wright*, 468 U.S. 737, 750 (1984). This doctrine:

> Embraces several judicially self-important limits on the exercise of federal jurisdiction, such as prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interest protected by the law invoked.

*Id.* at 741 citing *Valley Forge Christian College v. Americans United for Separation for Church and State, Inc.*, 454 U.S. 464, 474-75 (1982). Standing, at its "irreducible constitutional minimum," requires a plaintiff "to demonstrate: they have suffered an 'injury in fact'; the injury is 'fairly traceable' to the defendant's actions; and the injury will 'likely...be redressed by a favorable decision." *Public Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2201)(quoting *Lujan v. Defenders of Wildlife* 504 U.S. 444, 560-61 (1992)). An individual plaintiff has standing to challenge a corporation's federal tax status if: (1) he has suffered an injury in fact, (2) there is causal connection between injury and conduct complained of, and (3) injury will likely be redressed by favorable decision. *Nilavar v. Mercy Health System Western Ohio,* 142 F.Supp.2d 859, 883 (S.D.Ohio 2000).

57.     In the instant case, Chehade simply cannot show that ECFMG's 501(c)(3) status has caused him any harm. In particular, there is no causal connection between Chehade's alleged injury and the conduct of ECFMG. Since there is no harm to Chehade attributable to ECFMG, Chehade has no standing.

58.     In addition, Chehade's alleged injury would not be redressed even if the Court were to rule in his favor. In *Nickerson v. Texas*, 35 F.Supp.2d 512, 516 (E.D.Tex. 1998), *aff'd,* 209 F.3d 718 (5th Cir. 2000), *cert. denied,* 531 U.S. 814 (U.S. 2000), the Court held that

Plaintiffs, Employees of the Texas Department of Criminal Justice, were not entitled to relief. *Id.,* citing *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). The Court based its decision on the fact that prison guards, Plaintiffs in the case, did not in any way show that the relief sought, namely safe prison conditions, would in any way remedy their own situation. *Id.* In *Guerra v. Guajardo,* 466 F.Supp. 1046, 1053 (S.D.Tex. 1978), *aff'd,* 597 F.2d 769 (5th Cir. 1979), the Court also held that Plaintiffs must show that their injury is likely to be redressed by a favorable decision. *Id.,* citing *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38 (1976). There, the Court held that Plaintiff, a representative of Mexican purchasers, had no standing to sue since Plaintiff made no claim of harassment or extortion against himself. *Id.* Further, any alleged injury to Plaintiff was separate and distinct from any alleged injury to the Mexican purchasers. *Id.*

59. In the case at bar, Chehade's alleged injury would not be remedied even if the Court were to rule in his favor. Specifically, the tax status of ECFMG has no bearing on Chehade's inability to achieve ECFMG certification. At the very most, Chehade can only show he has been injured some "indefinite way in common with people generally." *See ASARO Inc. v. Kadish,* 490 U.S. 605, 614 (1989) (requiring taxpayers to demonstrate an injury distinct from that suffered by taxpayers in general).

**E.     ECFMG Has Committed No Wrongful Act or Omission**

60. The summary judgment evidence detailed above demonstrates that ECFMG has committed no wrong act or omission with respect to Chehade. Chehade's Motion contends that ECFMG have failed to meet his "needs." It is assumed by this, that Chehade is in some way contending that ECFMG has failed to satisfy some duty owed to Chehade.

61. But a review of the summary judgment evidence demonstrates that ECFMG has fulfilled any and all potential duties it may have possibly owed to Chehade. More specifically, the summary judgment evidence establishes the following facts and circumstances:

a. An ECFMG Certificate does not guarantee that a "certified" applicant will be accepted into a medical residency or fellowship training program. ECFMG certificate may be one of a multitude of criteria required of an applicant for a residency or medical internship by a residency program director. Each program establishes the qualifications and the levels of competency that it will accept for a residency program. Moreover, each State establishes the qualifications and the level of competency that it will accept for licensure as a medical professional. (APP004-APP005, ¶ 13-15)

b. The verification of medical credentials can be a lengthy process. Factors that may extend the verification process include processing time of the respective institutions; political climate in the relevant country; the nationality of the student; the sophistication of a country's communication infrastructure, including telephone and postal conditions; and any strife or civil unrest in the country in which the graduate attended medical school. (APP004, ¶ 12)

c. Chehade has previously admitted that he was not entitled to an ECFMG certificate until he passed the examination requirements. (APP067) From the time that ECFMG sent Chehade's medical diploma to his medical school for verification in August 1986 until ECFMG's receipt of the independent verification from the Romanian medical school in July 1990 (APP049–APP051), Chehade did not fulfill the medical education credential requirement for ECFMG certification. ECFMG did not notify Chehade that verification of his diploma had been received until after it was received in July 1990. (APP005, ¶ 18; APP023–APP024; APP026–APP027; APP029; APP032–APP033; APP039; APP049–APP051)

d. Between 1985 and 1989 (APP025), there was no correspondence from Chehade checking on the verification of his medical school credentials. (APP006, ¶ 19; APP025)

e. ECFMG had attempted to verify Chehade's medical diploma with his Romanian medical school in August 1986. Chehade never returned the attestation forms to ECFMG. (APP007, ¶ 23; APP024; APP026) There was no response from the medical school. (APP006, ¶ 21, APP007, APP026-027) Chehade was not even surprised the verification had not yet been sent from Romania. (APP028)

f. On August 24, 1989, ECFMG sent to Chehade a letter stating that in order to expedite the verification process, Chehade should contact the U.S. Embassy in Bucharest, Romania or his medical school in Romania. (APP032) ECFMG did not

receive a response from the medical school until July 5, 1990. (APP007, ¶ 26; APP049–APP051)

g. In July 1990, ECFMG received verification of Chehade's medical diploma from his medical school in Romania through the United States Embassy. (APP049–APP051) From that date, ECFMG had all documentation necessary to issue to Chehade a Standard ECFMG Certificate. From that date, Chehade could inform any residency program director that he had fulfilled the requirements for a Standard ECFMG Certificate. (APP053) But ECFMG has no record of any inquiry from any residency training program concerning Chehade or Chehade's ECFMG Certificate nor had Chehade returned his ECFMG Certificate for validation of his July 1990 English examination. (APP011, ¶39)

h. Chehade applied to residency programs all over the United States. In 1997 alone, Chehade applied for over 1000 medical residency positions across the United States. (APP076) Chehade was not offered one position for a medical residency or internship program. (APP076–APP079)

i. ECFMG did not participate in the decision making process of any residency training program that received an application for admission from Chehade. (APP012, ¶41)

j. Chehade admits that ECFMG did not guarantee him a job. (APP013, ¶44; APP080)

k. ECFMG did not enter into a contract with Chehade in which it agreed to verify his foreign medical diploma within a certain period of time. (APP013, ¶45)

l. ECFMG did not conspire with any person or entity to inflict a wrong or injury to Chehade. (APP013, ¶46)

m. Chehade admits he has no documents to prove collusion between ECFMG and a third party. (APP081–APP082)

n. Chehade was never an employee of ECFMG. Chehade did not seek employment with ECFMG. (APP013, ¶47)

62. With these facts in mind, it is difficult to imagine in what way ECFMG can be found to have failed to comply with any duty imposed upon it with respect to Chehade. Any delay in obtaining certification was due to factors wholly outside the control of ECFMG and/or Chehade's inability to provide the necessary information. Any failure for Chehade to obtain an

admission to a medical residency program or find any other employment was not cause by

ECFMG. ECFMG cannot be faulted for any alleged injury suffered by Chehade.

## VI.    OBJECTION TO EVIDENCE

63.    ECFMG objects to all evidence attached to Chehade's Motion for Summary

Judgment. Such evidence wholly fails to be properly authenticated.

## VII.    CONCLUSION

64.    Chehade's should be order to replead his Motion for Summary Judgment and

provide a more definitive statement. In the alternative, his Motion should be denied for the

reasons stated herein.

Respectfully submitted,

By: _____

Susan Abbott Schwartz
State Bar No. 00797900
Barry A. Moscowitz
State Bar No. 24004830
Mark C. Roberts II
State Bar NO. 00788293

HENSLEE, FOWLER, HEPWORTH
 & SCHWARTZ, L.L.P.
6688 N. Central Expressway, Suite 850
Dallas, Texas  75206-3913
(214) 219-8833
(214) 219-8866 – Fax

ATTORNEYS FOR DEFENDANT
EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

## CERTIFICATE OF SERVICE

The undersigned certifies that on this ___7TH___ day of June, 2002, a true and correct copy of the above and foregoing document was served upon the following party appearing *pro se* of record via certified mail, return receipt requested:

Jamal Elhaj-Chehade          *Certified Mail, Return Receipt:*  7002 0510 0004 4353 3706
5414 Cedar Springs, #806
Dallas, Texas  75235
(214) 521-7541

_____
Mark C. Roberts II

K.\35200\02\pldgs\Reply to C's MSJ-brief.doc

**BRIEF IN SUPPORT OF EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES
MOTION FOR MORE DEFINITIVE STATEMENT OR, IN THE ALTERNATIVE, RESPONSE TO
CHEHADE'S MOTION FOR SUMMARY JUDGMENT - Page 25**